UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No.2:08-CV-25-F

| | |
|---|---|
| DONNA H. RIDDICK ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | O R D E R |
| ) | |
| CITY OF ELIZABETH CITY ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the City of Elizabeth City's motion for summary judgment. [DE-27]. *Pro se* plaintiff Donna H. Riddick has responded, and the motion is ripe.

## I. STATEMENT OF THE CASE

Plaintiff initially filed a formal complaint with the Equal Employment Opportunity Commission on or about July 9, 2007, alleging discrimination by Defendant on the basis of her race. A right to sue letter issued on March 20, 2008. Proceeding *pro se* and *in forma pauperis*, Plaintiff Donna H. Riddick ("Riddick") filed this action on June 26, 2008, alleging that the City of Elizabeth City ("the City") discriminated against her on the basis of race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*

## II. STATEMENT OF THE FACTS

The facts, stated in the light most favorable to Riddick, are as follows.

Belinda Arnold (who is white) and Brenda Jones (who is black) interviewed Riddick (a black woman) for the job of part-time customer service representative for the Utilities Department of the City of Elizabeth. Both ladies recommended her for hire. Like all new City employees, Riddick had to serve a six-month probationary period to adjust to the new job and for

the City to closely assess the employee's suitability for the job. Essentially, a customer service representative processed payments from utilities customers, either in person (at the drive up window), over the phone, or by mail. This job had a wide variety of duties and daily deadlines that include balancing one's money drawer twice a day (accounting for all transactions and verifying totals). The job was in a fast-paced environment and required the customer service representatives to be good at multi-tasking.

Riddick began the job on April 19, 2007. The department manager, Ms. Arnold, gave Riddick papers stating the department's procedures, and told her that Ms. Jones would be training her. Ms. Jones worked with Riddick at the drive-up window for three days, showing Riddick how to do the job. Ms. Jones noticed Riddick had difficulty keeping up with the pace of the work, and Ms. Jones says Riddick told her that she was concerned about multitasking. Ms. Jones spent additional time with Riddick to help orient her to cashiering duties, including timely balancing procedures. Riddick was given extra work hours to become more proficient at the job.

At the drive-up window, other customer service representatives provided relief to the employee working the window when he or she needed to leave the window to balance her drawer or take a lunch break. At 11:00 a.m. on May 16, 2007, while Riddick was working at the drive-up window, another representative who was supposed to relieve Riddick at the window informed Ms. Jones that Riddick had to go balance her drawer. Apparently, it was time for Riddick's scheduled lunch break, but she could not leave until her drawer was balanced. Ms. Jones asked Riddick in a raised voice if she had not balanced yet that morning. Riddick stated she had not balanced, but she did not know she needed to balance first thing in the morning, and she had not yet mastered the balancing schedule. Another representative stepped forward, and offered to cover the window so Riddick could balance her drawer. Riddick went with Ms. Jones to the

back, and they got into a heated discussion, with Ms. Jones becoming irate and yelling about balancing. Ms. Jones said Riddick called her a liar. Riddick felt badgered, and she went to the manager, Ms. Arnold, complaining of being badgered and being spoken to like a child. The three ladies then discussed what had happened, and Ms. Arnold let Riddick leave the office for a lunch break and an afternoon off, if she chose. Riddick called Ms. Arnold to let her know she would not be coming back that afternoon, but she would return for her next scheduled work day on May 18, 2007.

On May 17, 2007, Riddick wrote a detailed letter describing the incident to the Mayor, Charles Foster, and warned him that the department had serious training issues. But Riddick never returned to work. On May 17, 2007, Ms. Arnold had an employee hand-deliver to Riddick's home a written memo informing Riddick of her termination. Ms. Arnold decided to terminate Riddick because, she stated, she did not have the skills for the job, including multitasking, and because of her attitude. Riddick had been on the job twenty-eight days. She had not undergone any formal or informal evaluations of her job performance. Nor had she received any warnings or been given feedback on things she needed to improve.

Riddick delivered her termination memo and her own letter to the Mayor. Mayor Foster (who is black) told her to talk with the City Manager, Richard Olson (who is white). She met with Mr. Olson on May 22, 2007. He responded to her concerns in a letter dated May 25, 2007. Mr. Olson had obviously talked with either Ms. Arnold or Ms. Jones, or both of them. His letter discussed the May 16 incident and described Riddick's behavior as "disrespectful" to Ms. Jones. He said Riddick called her supervisor a liar. He said that Riddick had never admitted she had made the mistake of forgetting to balance, but had remained adamant that she did not know she was supposed to. He stated that her supervisors did not think that she had the multitasking skills

needed to be a customer service representative. Riddick requested a hearing, but Olson's letter informed her that as a probationary employee she would not get a hearing.

The City states it filled the vacancy left by her dismissal with Kendra Bailey, a black female, in September 2007. However, Kimberly Murn, a white female, was rehired on June 21, 2007, just a month after Riddick was dismissed.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there exist no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Any analysis of the propriety of summary judgment must focus on both the materiality and the genuineness of the fact issues. *Ross v. Comm. Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48. The question of whether a fact issue is material is determined by reference to the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

As the Court explained in *Celotex*;

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex*, 477 U.S. at 322-23. Thus, the moving party may meet its burden as to an issue for which the non-movant will bear the burden of proof at trial by demonstrating that there is a lack of evidence to support the non-moving party's case. *Id.* at 325.

Furthermore, the proper standard for summary judgment mirrors that for directing a verdict under Rule 50(a) of the Federal Rules of Civil Procedure, whereby the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Anderson*, 477 U.S. at 250. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.' " *Id.* at 252 (internal citations omitted).

## IV. ANALYSIS

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's . . . race . . . ." 42 U.S.C. § 2000e-2(a)(1). Generally, a Title VII plaintiff may establish a claim for intentional discrimination via the judicially-created burden-shifting pretext framework, as espoused in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the familiar *McDonnell Douglas* scheme, Plaintiff first

must establish a prima facie case of discrimination. *See id.*, 411 U.S. at 802 . If Plaintiff establishes a prima facie case of discrimination, the burden shifts to the City to produce a legitimate, nondiscriminatory reason for the adverse employment action. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If the City meets its burden of production, the presumption of discrimination created by the prima facie case disappears from the case, and Plaintiff then must prove that the City's articulated reason was a pretext for unlawful discrimination. *See id.* at 253-55. In light of *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000), a plaintiff is no longer required to show pretext *plus* some additional evidence of discrimination. *Id.* at 148; *see Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000). Rather, the ultimate fact of discrimination may, in appropriate cases, be inferred from the falsity of a defendant's proffered explanation. *Rowe,* 233 F.3d at 830. Additionally, under *Desert Palace v. Costa*, 539 U.S. 90 (2003), Plaintiff may offer evidence to support a finding that the City's reason, "while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristics." *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). "Although the evidentiary burdens shift back and forth under the McDonnell Douglas framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Love-Lane v. Martin*, 355 F3d 766, 786 (4th Cir 2004) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

In this case, for the reasons set forth below, Riddick fails to establishes a prima facie case of race discrimination, and, even if she had, she does not proffer sufficient evidence of pretext to overcome the City's legitimate, non-discriminatory reason for its decision to dismiss her.

**A. Prima Facie Case**

Under the *McDonnell Douglas* framework, a plaintiff can establish a prima facie case of racial discrimination by evidence that she: (1) was a member of a protected class; (2) was performing her job satisfactorily; (3) was subjected to some adverse employment action, such as discharge; and (4) was either replaced by an employee outside the protected class or the employer did not treat other, similarly-situated employees outside the protected class as harshly. *See McDonnell Douglas*, 411 U.S. at 802-04; *see also Reeves*, 530 U.S. at 142 (setting forth prima facie elements in age discrimination context). In this case, Riddle has failed to make out a prima facie case because she has failed to establish the second prong of the *McDonnell Douglas* framework–that she was performing her job satisfactorily. In fact, the evidence demonstrates that she had failed to balance her drawer when she was supposed to, that she did not in fact even know when or how frequently she was supposed to balance her drawer, and that balancing her drawer was a key task of her job. The evidence further shows that when Ms. Jones pointed out this failing one day, Riddle reacted poorly by failing to admit she did not balance her drawer and instead blaming any deficiency in her work on poor training by Ms. Jones. The evidence shows that Ms. Jones spent extra hours training Riddick in her cashiering and balancing duties, and that Ms. Jones had previously noted that Riddick had problems handling the pace of the work and the multi-tasking required. Thus, Riddick has failed to prove that her job performance was satisfactory as required by the second prong of the *McDonnell Douglas* framework.

**B. Pretext**

   **1. Plaintiff's Evidence**

   Furthermore, even assuming that Plaintiff could establish a prima facie case of racial discrimination, Riddick has failed to show that the proffered reasons for her dismissal were pretextual. The City has met its burden of establishing a legitimate, non-discriminatory reason

for her dismissal: she failed to keep up with her job expectations (periodic, timely balancing of her drawer) and got into a heated discussion over it with her supervisor, who already had concerns that Riddick could not keep up with the multitasking required of the job. This explanation is sufficient to shift the burden to Riddick, who must show that the legitimate reasons offered by the City were not its true reasons, but were a pretext for discrimination. This burden on plaintiff merges with Plaintiff's ultimate burden of persuading the court that she is the victim of intentional discrimination. *Burdine*, 450 U.S. at 256.

Riddick fails to offer sufficient evidence of pretext and racial discrimination. She does not have direct evidence of discrimination, so she turns to circumstantial evidence. Riddick offers evidence of an outside assessment of her department three years prior to her termination. The reviewer concluded that the department was stressful with a heavy workload and a subpar management style and culture. This evidence does nothing to rebut the City's evidence that she did not perform satisfactorily on the job. It might explain why the job was so difficult, but the City nonetheless required her to know her job and to balance on time–something she did not do.

Riddick also offers indirect evidence of discrimination through hiring and firing facts in the Utilities Department. The court has reviewed the evidence carefully: City records of (1) "Customer Service Division: Employee Turn-over Previous 15 Year Period" (showing a generated on date of "3/16/2009"); and (2) "Customer Service Division: Employee Turn-over Previous 2 year Period" (showing a generated on date of "5/24/2007" ). Pl. Opposition Mem., Exhs. 10 & 12 [DE-35-11 & DE-35-13]. These records show names, hiring and departing dates, employee status, gender, race, and separation status, and the two-year turnover document also shows reason for leaving. Thus, the court has a good picture of the department's hiring and firing practices. But the court concludes after a careful analysis that this evidence, even seen in

the light most favorable to Plaintiff, is inconclusive. It does not allow the reasonable inference that the City intentionally discriminated against Riddick on the basis of race.

The employment data viewed in the best light for Plaintiff indicates that of the five *black* female customer service representatives leaving the department in the two years prior to her dismissal, three were fired ("probationary release") and two resigned. Of the nine *white* females leaving in that period, only one was fired, and eight resigned (seven of whom were probationary). All firings of the probationary employees, black or white, were due to "unsatisfactory job performance." The reasons for the several white employees resigning varied from caring for an ill family member, to a scheduling conflict (three employees), to not liking the "fast pace environment," to one who simply did not report to work. The two black employees resigning also did not like the "fast pace environment." The data shows more white employees than black employees resigned. The data also shows that another white employee in the department, a customer service technician, was fired for unsatisfactory job performance. The court concludes that the employment data proffered by Plaintiff would not allow Plaintiff to prevail on her ultimate burden of proving that the City intentionally discriminated against her because of race.[1] This conclusion is particularly firm given the strong inference of no discrimination applicable to these facts, as discussed below.

### 2. Same Decisionmaker

Because Riddick was both hired and fired by the same decisionmaker within a very short

---

[1] Riddick also proffers irrelevant evidence of employee policies, such as performance reviews and a grievance process. Riddick had been there less than a month; she was still probationary. It is difficult to see how she was entitled to some performance review, and the grievance process apparently was not applicable to probationary employees. Nothing in the evidence of the employee manual and policies rebuts the City's legitimate reason for dismissing her–that she did not do her job satisfactorily.

period of time, there is a strong inference that discrimination was not the determining factor for her dismissal. *Proud v. Stone*, 945 F. 2d 796, 798 (4th Cir. 1991) ("While we can imagine egregious facts from which a discharge in this context could still be proven to have been discriminatory, it is likely that the compelling nature of the inference rising from facts such as these will make cases involving this situation amenable to resolution at an early stage."); *see also DeJarnette v. Corning*, 133 F. 3d 293, 298 (4th Cir. 1998) (applying inference). Plaintiff had only been on the job twenty-eight days; she was hired presumably shortly before she started working. Belinda Arnold, Customer Service Manager of the department, and Brenda Jones,[2] interviewed Riddick and recommended her for hire. After the May 16 incident, Ms. Jones told Ms. Arnold that Riddick was not good at mutlitasking, and Ms. Arnold decided to fire Riddick. Thus, the same decisionmaker both hired and fired Plaintiff within a relatively short time. The same decisionmaker inference applies here, an inference that the City's stated reason for dismissing her is not pretextual. *See Proud*, 945 F.2d at 798 ("When the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer[.]"). Plaintiff's proffered evidence falls far short of overcoming this inference.

Riddick has failed to provide any evidence that racial discrimination was the real reason for her termination instead of the reasons proffered by the City. Simply put, Riddick cannot carry her ultimate burden of demonstrating that she was terminated because she was black. Ultimately, in fact, there is no evidence from which a reasonable jury could conclude Plaintiff was entitled to

---

[2] Riddick claims Jones was not her supervisor. Ms. Arnold, the department manager, attested that Ms. Jones was Riddick's supervisor. Arnold Aff. ¶ 2 [DE 27-2]. Plaintiff's own exhibit (Exhibit 17 to her summary judgment opposition) indicates Brenda Jones was a "Sr. CS Clerk" as of July 10, 2007, when she was promoted. [DE 35-16]. Presumably, that means Ms. Jones' title was a *senior* customer service clerk when Riddick was working there.

a verdict. Thus, summary judgment in Defendant's favor is proper. *See Reeves*, 530 U.S. at 147 (noting it is not enough to disbelieve the defendant–a factfinder must believe plaintiff's explanation of intentional race discrimination). Accordingly, summary judgment for the City is appropriate.

## V. CONCLUSION

For the foregoing reasons, the Defendant City of Elizabeth City's motion for summary judgment [DE-27] is ALLOWED and this matter is dismissed.

SO ORDERED.

This the 15th day of July, 2009.

James C. Fox
Senior United States District Judge